SPESSARD L. HOLLAND, as Governor of the State of Florida, J. M. LEE, as Comptroller of the State of Florida, NATHAN MAYO, as Commissioner of Agriculture of the State of Florida, J. EDWIN LARSON, as Treasurer of the State of Florida and J. TOM WATSON, as Attorney General of the State of Florida, as and constituting the Trustees of the Internal Improvement Fund of the State of Florida, a body politic under the laws of the State of Florida, State of Florida and Fort Pierce Inlet District, a public corporation under the laws of the State of Florida, v. FORT PIERCE FINANCING AND CONSTRUCTION COMPANY, a corporation under the laws of the State of Florida.

27 So. (2nd) 76  June Term, 1946
June 25, 1946  En Banc
Rehearing denied July 22, 1946

J. Tom Watson, Attorney General, *Lamar Warren* and *D. Fred McMullen,* Assistant Attorneys General, and *Julius F. Parker,* for Trustees of the Internal Improvement Fund of the State of Florida, *Carlton & Ellis* and *D. C. Smith,* for Fort Pierce Inlet District, appellants.

*Milam, McIlvane & Milam,* for appellee.

WHITEHURST, Circuit Judge:

The bill of complaint filed in this case on the 20th of August, 1942, in substance avers that plaintiff in the years 1919-1920 purchased for a consideration of approximately $150,000 certain lands at the City of Fort Pierce, St. Lucie County. That said lands actually fronted on Indian River, a navigable stream. That said land was bounded by the high water mark of the Indian River, and that plaintiff acquired the fee title to said lands with full riparian rights. That after securing the necessary permit from the United States engineers, plaintiff proceeded to construct a bulkhead approximately 750 feet out in the river and paralleling the shore line some 1700 feet in length. That by process of dredging plaintiff filled in behind the bulkhead so that the area between the shore line or highwater mark and the bulkhead became filled in land with surface elevation several feet higher than normal high water mark. That plaintiff subsequently constructed an extension of said bulkhead northward for approximately two thousand feet, behind which extension the area was filled in by the same process, so that the filled in lands comprise an area of approximately sixty acres, bounded on the east by said bulkhead approximately 3700 feet, and on the west by the old shore line of the river. That the lands were filled, in the direction of the channel of the river but do not obstruct the channel, and leave full space for the requirements of commerce. That the bottom of the river where the bulkhead was constructed and the land filled in, sloped gradually eastward from high water mark of the river toward the channel, from zero to a depth approximately six feet at the bulkhead, and that the area so filled was never any part of

an island, shallow bank or bar. That in addition to the purchase price of the uplands, plaintiff and its grantees have expended more than one million dollars in bulkheading, filling, reclaming and construction of improvements on said lands. That when plaintiff purchased the said uplands the river had not been dredged to sufficient depth to accommodate sea-going vessels and said uplands were not accessible to deep water and no inlet had been dredged across the river to the Atlantic ocean and said property had no substantial value until plaintiff dredging a channel across the river, dug a turning basin, dredged slips, constructed piers, and installed spur connections across the filled in lands. That in 1941, the legislature of Florida enacted Chapter 21546, special acts, which said Act attempted to invest the Trustees of the Internal Improvement Fund with title to all of the land so bulkheaded and filled in by plaintiff, the purpose of said Act by its terms being to authorize the Trustees to sell, transfer and convey said lands upon such terms as they might direct. That in pursuance of said Act the Trustees were proceeding to sell and transfer said land to Fort Pierce Port District. Whereupon plaintiff, for itself and its grantees, filed with the Trustees timely protests in accordance with section 253.14, Florida statutes 1941, and that said protests and objections were by the Trustees overruled. The prayer of the bill is that Chapter 21546, Acts 1941, be held unconstitutional as violative of sections one and two, Declaration of Rights, Florida Constitution, and section 29 of article 16 thereof, and that the Trustees be restrained from asserting title to, or disposing of said lands.

On the 1st of February, 1943, the Trustees filed their answer to the bill, incorporating counter-claim and motion to dismiss. The State of Florida through the Attorney General was permitted to intervene as a defendant on the 26th of March, 1943, and thereupon filed answer.

The answers of the Trustees and of the State principally present questions of law, depending on the construction and application of Chapter 8537, Acts 1921.

The Trustees also aver in their answer that the bottom of the river where plaintiff bulkheaded and filled in, sloped eastward from high water mark of plaintiff's uplands toward the

channel, beginning at zero and running out to six feet or more at the bulkhead, and that the lands making up the bottom of the river in front of plaintiff's uplands consisted of shallow banks and bars along the shore, within the provisions of section 253.12 Florida statutes 1941, and so were within the exception of Chapter 8537, Acts 1921, by Section 9 thereof.

On April 28, 1944, the Fort Pierce Inlet District was permitted to intervene as a defendant on the condition that it be bound by the status of the case at that point, as well as the stipulation theretofore filed between counsel for plaintiff and defendants, Trustees and the State of Florida.

The answer of the Fort Pierce Inlet District, like those of the other defendants, largely presents questions of law.

By the stipulation mentioned, it was admitted that plaintiff was vested with the legal title to and actual possession of the several tracts of land described in the bill of complaint on approximately the dates alleged in the bill; That each of said tracts actually fronted upon Indian River, a navigable stream, and that plaintiff's title to said uplands extended to the high water mark of the Indian River, and included such riparian and other rights as are granted to upland owners of water front property by the statutes of the State of Florida.

After the proof was in and upon final hearing the Chancellor entered final decree on the 21st of August, 1945, finding that plaintiff was seized of fee simple title to the lands described in the bill to high water mark, with full riparian rights. That Construction Company erected permanent bulkhead and piers and made the fill as shown by the plat. plaintiff's exhibit 6. That none of the lands so improved at any time were part of any island, sand bar, shallow bank, small island or bar or shallow bank along the shores of the mainland. That the bottom of the Indian River here sloped gradually eastward without any submerged irregularities or obstructions. That the improvements in nowise interfered with navigation and were duly authorized by the United States. That Construction Company granted various parcels of these lands by warranty deed. That Construction Company and its grantees expended more than one million dollars in improving said lands and found that Chapter 8537, Acts of

1921, constituted a continuing offer by the State to riparian owners to improve their lands, as was done here, and that by so doing title became vested in the Construction Company and that the attempted divesting of this title by special legislative act was illegal and the Act unconstitutional, and permanently enjoined and restrained the defendants, Trustees of the Internal Improvement Fund of the State of Florida, the State of Florida and Fort Pierce Inlet District, a public corporation, severally, from asserting any title or right in and to the described lands, or from attempting to dispose of the same under the provisions of said Chapter 21546 or otherwise.

From this decree the defendants, Trustees of the Internal Improvement Fund, the State of Florida and Fort Pierce Inlet District, a public corporation, appeal.

The appellants, the Trustees and the State of Florida, have grouped the Assignments of Error into four questions for consideration on this appeal, as follows:

No. 1. "Does a private corporation for profit, owning uplands down to the high water mark of the navigable stream, by bulkheading and filling in the submerged lands below said high water mark pursuant to a supposed grant under Chapter 8537, Laws of Florida, 1921, become vested with the title to the filled in lands if prior to such bulkheading and filling the waters covering said submerged lands were employed for boating, for anchoring and beaching boats, for fishing by commercial fishermen and others and for commercial fishermen to dry and repair their nets and racks situated therein."

No. 2. "Does a private corporation for profit, owning uplands down to the high water mark of a navigable stream by bulkheading and filling in the submerged lands below said high water mark pursuant to a supposed right under Chapter 8537, laws of Florida, 1921, become vested with the title to said filled in lands if such bulkheading and filling result in the corporation monopolizing the port and port facilities of the harbor in which the filled in lands are located."

No. 3. "Does a private corporation for profit, owning uplands down to the high water mark of a navigable stream by bulkheading and filling in the submerged lands below said high water mark pursuant to a supposed grant under Chap-

ter 8537, Laws of Florida, 1921, become vested with the title to the filled in lands if prior to such bulkheading and filling the bottom of said stream at the point of bulkheading and filling was sand and sloped gradually towards the channel of the stream from a depth of zero at said high water mark to a depth of five and a half feet at said bulkhead."

No. 4. "Is Chapter 21546, Laws of Florida, 1941, constitutional?"

We shall consider first, question No. 3. In the case of State ex rel. Buford v. City of Tampa, 88 Fla. 196, 102 So. 336 this court upheld the validity of Chapter 8537, Acts of 1921, divesting the State of title to lands covered by water lying in front of tracts of land owned by any person, natural or artificial, fronting upon any navigable stream or bay of the sea as far as the edge of the channel and giving to such riparian owners the right to wharf out or fill up from the shore, not obstructing the channel, and upon the land so filled in to erect improvements consisting of buildings, warehouses, etc.

We also held in the case of Pembroke v. Peninsula Terminal Company, 108 Fla. 46, 106 So. 249, "That the acts of 1856 and 1921 divest the State of its title to lands covered by water, lying in front of upland owned by any citizen holding title to the high water mark of any navigable stream, or bay of the sea, or harbor as far as the edge of the channel, and vests the title to the same in such riparian proprietors for certain named purposes, such as the building of wharves and filling up from the shore as far as may be desired, not obstructing the channel, etc. The act of 1921 embraces the word 'subject to any inalienable trust under which the State holds said lands,' which were not in the older act. These acts . . . evidence a public policy established under legislative authority beginning as far back as 1856, under which the State may part with the title to certain portions of its lands under navigable waters of the kind, and under the conditions described in the statutes, which policy and authority cannot be lightly disregarded by the courts."

The riparian act of 1921 vests in the riparian owner, ie., the owner of upland extending to high water mark on any navigable stream, bay of the sea or harbor, title to the sub-

merged area from the high water mark in direction of but only to the edge of the channel, but the title thus vested is a qualified one, which will become absolute when and if the upland owner shall actually bulkhead and fill in from the shore.

The only limitation placed upon the riparian proprietor is that in the exercise of the right granted by the Act he shall so construct the improvement authorized as not to obstruct the channel and that full space shall be left for the requirements of commerce.

When a riparian owner bulkheads and fills in the submerged area in the manner and within the limitation specified in the riparian Act of 1921 the title to the filled in land becomes absolute and equal to that of the upland. Commodore Point Terminal Company v. Hudnall, 283 Fed. 150; Trumbull v. McIntosh, 138 So. 34, 103 Fla. 708.

The coast and geodetic charts and other charts introduced, as well as the testimony of the engineers, show that the channel at the point of appellee's development was about 2500 feet east of the western shore of the river and considerably farther from the eastern shore. It is further shown that if both shores of the river at this point had been filled in with a 750 foot strip on each side of the river there still would have remained 9000 feet between the shores, the river being at this point about two miles wide.

It will be observed therefore that appellee did not bulkhead and fill in to the edge of the channel but stopped far short of that point, thus not obstructing the channel but leaving full space for the requirements of commerce. Moreover, appellee before constructing the bulkhead and fill obtained the necessary permit from the U. S. engineers, whose province it is to determine whether the proposed improvement will interfere with navigation and commerce. USCA Title 33, Navigation in the Navigable Waters, Sections 401-403.

As was stated by Mr. Justice TERRELL for this court, in Caples v. Taliaferro, 197 So. 861, 144 Fla. 1, "It may be regarded as settled that the title to all submerged lands, whether tide or fresh, is held by the states in trust for all the people of the respective states, that such trust is governmental and may not be completely alienated, but that in the interest of the

people the state may grant to individuals limited privileges of rights in said lands." Also see Brickel v. Trammel, 77 Fla. 544, 82 So. 221. And the riparian Act of 1921 did alienate sovereignty lands, being the submerged lands under navigable streams, bays or the sea, and harbors, granting them to riparian owners under certain conditions and within certain limitations. The purpose of the Act being to encourage riparian owners to improve their water-front property as therein specified, but making the full title conditional upon the actual completion of the improvement or development mentioned in the Act. The riparian owner is restricted in the right granted by the Act in that he cannot bulkhead and fill in or otherwise improve the submerged area in front of his uplands beond the edge of the channel, nor can he so construct the improvements mentioned in the Act as to obstruct the channel so as to interfere with navigation or to interfere with the requirements of commerce. Pembroke v. Peninsula Terminal Company, supra.

In the case of Trumbull v. McIntosh, supra, it was stated "The right to fill in, to utilize and to protect the submerged land as authorized, is the qualified title that is vested by the statute in the riparian owner. Filling in is the proprietary use of the submerged land that is contemplated by the statute in making the qualified grant. The source of title to the submerged land is the statutory right vested in the riparian owner; not the process of filling in."

Appellants contend that Chapter 8537, Act of 1921, does not authorize an upland owner to bulkhead and fill in the submerged sovereignty lands below the high water mark of his upland property, if to do so would be out of harmony with and contrary to the trust relationship existing between the sovereign and its people, and urges that the bulkheading and filling done by the appellee was done in contravention of the limitation as to the inalienable trust placed upon the grant contained in Chapter 8537.

We cannot agree with the appellant's contention that appellee's improvement of the area involved, and its subsequent use amounted to a transgression of the inalienable trust doctrine. We think the test in cases of this kind is: That if

the grant of sovereignty land to private parties is of such nature and extent as not to substantially impair the interest of the public in the remaining lands and waters it will not violate the inalienable trust doctrine. Pembroke v. Peninsula Terminal Company, supra.

That appellee bulkheaded and filled in toward the channel of the river is not denied. The proof shows that ample space was left for the purpose of navigation and for the requirements of commerce, and that the paramount authority of the federal government was obtained for the construction of the improvement. The appellee having proceeded in accordance with the requirements of the riparian Act of 1921, its title to and possession of the land so bulkheaded and filled in became as valid and indefeasible as that of its upland.

Appellants also apparently contend that the submerged lands in front of appellee's upland was of such character and formation as to come within the reservations of Chapter 8537, Acts 1921, and by section 9 of said Act, the same being sections 253.12 and 253.13, Florida statutes 1941, and that the same constituted shallow banks and bars along the shore within the provisions of said sections.

We do not agree with appellants in this contention. The proof shows without contradiction that the submerged land in front of appellee's property sloped gradually from zero at high water mark to a depth of approximately six feet at the bulkhead, without intervening irregularities or obstructions. This character of submerged land does not come within the classification of the cited sections and consequently was not within the reservation specified therein. On the contrary, it was of the very character intended by the riparian Act to be qualifiedly vested in the upland owner.

Having reached the conclusion that the appellee lawfully exercised its proprietary right in filling in and improving the land involved, it necessarily follows that the first question posed by the appellants must be answered in the affirmative.

The incidental use by the public of the foreshore and adjacent waters of a navigable stream such as the one here under consideration must yield to the paramount proprietary right of the riparian owner, when and if he constructs the im-

provement specified in the Act, and within the limitations prescribed. To hold otherwise would be to defeat the purpose and intent of the Act.

In the case of Panama Ice & Fish Company v. Atlanta & St. A. B. Railway Co., 71 Fla. 419, 71 So. 608, this court held, referring to the 1856 riparian Act, "This statute does not vest in the riparian owners an unqualified fee in the lands below high water mark and out to the edge of the channel in navigable streams, bays of the sea, and harbors of this state. *So long as such submerged lands remain unimproved by the construction of wharves or unreclaimed by filling in from the shore and converting water into land,* the riparian owner, though the legal title is in him, has insofar as the statute is concerned, no greater right to the beneficial use of such submerged lands and the waters above them than any other citizen, except for the purpose of protecting from invasion the right to improve which the statute gives."

We come now to a consideration of the second question posed by appellants the factual premise of which we think is not sustained by the record.

It is true that the Fort Pierce Inlet District, a public taxing authority constructed an inlet connecting the Indian River with the Atlantic ocean, designed to encourage the development of a port at Fort Pierce in the general interest of the public.

Across the Indian River, a distance of some two miles, from this inlet the appellee purchased the upland already referred to herein and proceeded to expend vast sums of money in improving the water frontage by dredging channels and turning basins, erecting piers, installing bulkhead, filling in land, constructing docks, packing houses, precooling plants, etc., which development and its use has extended over a period of some twenty-five years.

To make this improvement usable and beneficial, appellee dug a deep water channel across the Indian River, connecting its development with the inlet, and dredged to sufficient depths of water along side the piers to accommodate deep draught vessels and also dredged out a turning basin some eight hun-

dred feet by thirteen hundred feet, all done at appellee's expense.

It also appears that the City of Fort Pierce owns one of the two piers on the deep water. The City's pier fronts 290 feet on the river and extends back in the slip 330 feet. This pier was deeded to the City of Fort Pierce by the appellee in 1928. The recitals in the deed show that the property was granted to the City on the express condition that the City "make only such reasonable charges for the use of said wharves, piers and warehouses as will be necessary to pay expenses" and that the property "shall be held for public use and shall be inalienable." The grant is further conditioned on the property being used for "public terminal and transportation purposes only" and authorized the City to convey the property therein granted to a port board or harbor commission if such a corporation is organized or created by a future Act of the Legislature." The apparent purpose of this conveyance was to give to the public authorities a pier on the deep water that can be used for the further development of the harbor of Fort Pierce and which would always be available to the public's use.

The only deep water facilities of the port are the two piers owned by the City and the Terminal Company. It may be observed in this connection that other water front property is equally available to others for like development and for the equal use of the inlet above referred to.

It appears that an extensive commerce has been developed at this port. It was largely by the vast expenditure of capital by appellee and its grantees that the possibilities of the port were developed and its facilities expanded.

Other upland owners in the vicinity have equal right to develop their water front property, under the same conditions, as appellee did, and to have equal access to the inlet, heretofore referred to, Moreover, as pointed out by appellee in its brief, the Act creating the inlet district gives to the District the right of condemnation of any lands, easements, or other property needed for its purposes, which right is always available under certain prescribed conditions, and in which case

just and fair compensation would be made for the private property taken.

Clearly the use by appellee of the port and its lawfully developed property does not constitute a monopoly of the port. On the contrary, it may be reasonably concluded that the extensive development by the appellee and its grantees has resulted in a large and beneficial commerce in connection with the port. This undoubtedly was one of the objectives contemplated by the legislature in the enactment of the riparian statute.

We think this is sufficient answer to appellant's second question. It necessarily follows that Chapter 21546, special acts, 1941, is unconstitutional. Seizure and confiscation of private property, as designated and attempted by said Act is in contravention of well known constitutional guaranty. There being no error shown in the record, the decree appealed from is affirmed.

CHAPMAN, C. J., TERRELL, BROWN, BUFORD, ADAMS and SEBRING, JJ., concur.